# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40360

United States Court of Appeals
Fifth Circuit

**FILED**
July 27, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JAMES CECIL HOLLEY, JR.,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, PRADO, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted Appellant James Cecil Holley, Jr. of conspiracy to commit a drug trafficking crime, felon in possession of a firearm, and possession of a firearm in furtherance of a drug trafficking crime. Holley now challenges all three convictions, and we AFFIRM.

I.

On March 6, 2008, Officer Travis Putman received information from a confidential informant that Holley was distributing large quantities of marijuana in the Dallas area. Putman conducted a records search and determined that Holley was associated with a house located at 6203 Gray Wolf Trail. A different officer traveled to the house on two separate occasions and

used a trained canine to "conduct[] a free-air sniff of . . . [the] garage door."  On both occasions, the dog "alerted to the presence of the odor of an illegal drug while sniffing the garage door."  Based largely upon the canine alerts, Putman sought and received a search warrant for the Gray Wolf Trail house.  During the search, officers discovered $9,990 in cash, a money counter, digital scales, ten pounds of marijuana, a marijuana seed, two trays of drying marijuana, a Heckler and Koch ("H&K") .45 caliber handgun, two loaded magazines, a drug ledger, and a utility bill for a house on Winterwood Lane in the name of Justin Dismore.  Holley was present at the time of the search and seated a short distance from the handgun.

After locating the utility bill, officers began to investigate the house on Winterwood Lane.  As with the Gray Wolf Trail house, an officer traveled to the Winterwood Lane house and used a trained canine to conduct a "free-air sniff" of the "garage door."  The dog again "alerted to the presence of the odor of an illegal drug while sniffing the garage door."  Based upon this alert and the utility bill found at the Gray Wolf Trail house, the officers obtained a search warrant for the house on Winterwood Lane.  That search resulted in the discovery of a large hydroponic marijuana cultivation operation, 263 marijuana plants, and evidence linking Holley to the house.  In 2009, investigators searched two other houses connected with Holley, one on McShann Road and one on Harvest Hill Road.  Holley and Blake Huggins were present when officers executed the search warrant for the McShann Road house.  Inside the house, officers discovered another hydroponic marijuana cultivation operation, 273 marijuana plants, 16 bags of hydroponic marijuana (with a total weight of around 11 pounds), a digital scale, a drug ledger, evidence that Holley was living there, a utility bill for the property in the name of Louis Lee, and a sales receipt in Lee's name.  During the search of the Harvest Hill Road house, officers learned that it was being occupied by

No. 15-40360

Huggins and Michael Strickland. In Huggins's room, officers found a schematic drawing for a hydroponic marijuana cultivation system and a list of items needed to build the system.

On May 28, 2014, a federal grand jury in the Eastern District of Texas returned a superseding indictment charging Holley with three counts: one count of conspiracy to commit a drug trafficking crime in violation of 21 U.S.C. § 846, one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Prior to trial, Holley moved to suppress the evidence discovered during the searches of the Gray Wolf Trail, Winterwood Lane, and McShann Road houses. Holley argued, in relevant part, that the dog sniffs used to obtain the warrants for the Gray Wolf Trail and Winterwood Lane houses violated the Fourth Amendment, relying principally on the Supreme Court's decision in *Florida v. Jardines*.[1] The district court denied all three motions to suppress.

Holley's case was tried to a jury from June 3-6, 2014. The Government presented testimony from one of Holley's former customers, Meina Azez, and two of Holley's former co-defendants who pleaded guilty and agreed to cooperate, Justin Brown and Jason Sirovica. Brown testified that he bought large quantities of marijuana from Holley on a regular basis. At some point, he started his own grow operation using seeds extracted from marijuana purchased from Holley. Brown explained that two individuals helped him with his grow operation, Corey Armstrong and Jason Sirovica. Brown elaborated that a third individual, Nick Neighbors, assisted both him and Holley. Brown also recounted that Holley and his associate, Michael Strickland, unexpectedly stopped by his "grow room" on one occasion. Holley and Strickland noticed that

---

[1] 133 S. Ct. 1409 (2013).

3

No. 15-40360

Brown's plants were healthy and producing well. As a result, they asked "what chemicals [he] was using," and Brown told them. Sirovica testified consistently with Brown. He confirmed that he and Brown used to buy marijuana from Holley and started growing their own. Sirovica testified that he and Brown worked together, although they both grew marijuana separately as well. He added that Strickland—who is an electrician—helped him wire one of his "marijuana grows." The Government established through other witnesses that: (1) the Winterwood Lane house was leased in Holley's name; (2) Strickland was listed as the emergency contact on the lease for the Winterwood Lane house; and (3) the H&K handgun found at the Gray Wolf Trail house had been manufactured in Germany.

At the close of the Government's case, Holley moved for a judgment of acquittal. Following a thorough review of the evidence, the district court denied this motion. The jury subsequently returned a guilty verdict on all counts. Holley renewed his motion for a directed verdict, but the district court again denied it. In March 2015, the district court sentenced Holley to 185 months of imprisonment followed by 8 years of supervised release. Holley timely appealed to this Court.

## II.

On appeal, Holley presses four arguments: (1) the district court erred in denying the motions to suppress; (2) there was insufficient evidence to convict on Count One because the Government proved only that he conspired to distribute marijuana, not marijuana plants; (3) there was insufficient evidence to convict on Count Three because the Government proved only that he used a gun to further a conspiracy to distribute marijuana, not a conspiracy to distribute marijuana plants; and (4) there was insufficient evidence to convict on Counts Two and Three because the Government proved only that the H&K handgun moved in foreign commerce, not interstate commerce.

4

No. 15-40360

A.

Holley argues that the district court erred in denying all three motions to suppress. As below, he urges that the dog sniffs of the Gray Wolf Trail and Winterwood Lane houses violated the Fourth Amendment under the Supreme Court's recent decision in *Florida v. Jardines*. He further argues that the McShann Road warrant was fruit of the poisonous tree because it was based in part on these searches. The Government responds that the dog sniffs did not violate the Fourth Amendment. Alternatively, the Government argues that the good faith exception applies. We start with the good faith exception. For purposes of our analysis, we assume without deciding that the dog sniffs violated the Fourth Amendment.

In his briefing, Holley argues that "*Leon* is not applicable in the instant case because the warrants were based upon the preceding unconstitutional and warrantless dog sniff searches."[2] That is, Holley urges that the *Leon* good faith exception is categorically inapplicable when a warrant is obtained using tainted evidence—or is fruit of the poisonous tree. This position is inconsistent with this Court's recent decision in *United States v. Massi*.[3] In *Massi*, this Court held that evidence seized pursuant to a warrant is admissible—even if the warrant was the product of an illegal search—if two requirements are met:

> (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer

---

[2] Holley's Reply Brief at 12.
[3] 761 F.3d 512 (5th Cir. 2014).

No. 15-40360

in good faith as prescribed by *Leon*.[4]

There is no allegation that the officers did not seek the Gray Wolf Trail and Winterwood Lane warrants in good faith. As a result, the only question is whether the dog sniffs were "close enough to the line of validity" that an objectively reasonable officer would not have realized that the resulting warrants were tainted.

Although the issue is close, we are persuaded that the good faith exception applies. The disputed dog sniffs took place in 2008. At that point in time, this Court had issued only one decision, albeit an unpublished one, that addressed a similar search, *United States v. Tarazon-Silva*.[5] In *Tarazon-Silva*, this Court upheld a "dog-sniff of the outer edge of the [defendant's] garage and the dryer vent on the exterior wall of the house" because it "did not occur on protected curtilage."[6] This outcome was consistent with several other pre-*Jardines* decisions addressing dog sniffs of garage doors.[7] Indeed, Holley does not point us to a single pre-*Jardines* decision that invalidated a search factually similar to those under review. Even if not binding or conclusive, this uniform case law demonstrates that the dog sniffs were "close enough to the line of validity" that an objectively reasonable officer would not have realized that the Gray Wolf Trail and Winterwood Lane warrants were tainted. In these circumstances, "[t]o suppress the evidence derived from th[ese] warrant[s] would not serve the interest of deterring future constitutional

---

[4] *Id.* at 528.

[5] 166 F.3d 341 (5th Cir. 1998) (unpublished table decision).

[6] *Id.* at *1.

[7] *See, e.g.*, *United States v. Vasquez*, 909 F.2d 235, 238 (7th Cir. 1990); *United States v. Hogan*, 122 F. Supp. 2d 358, 367-69 (E.D.N.Y. 2000); *Stauffer v. State*, No. 14-03-00193-CR, 2004 WL 253520, at *2-3 (Tex. Ct. App. Feb. 12, 2004) (unpublished); *Smith v. State*, No. 01-02-00503-CR, 2004 WL 213395, at *3-4 (Tex. Ct. App. Feb. 5, 2004) (unpublished).

violations."[8]  We affirm the denial of the three motions to suppress.

We do not hold—as the dissent suggests—that "a search is reasonable so long as no court has explicitly found a search under identical circumstances to be unreasonable."  Prior to *Jardines*, thirteen different federal and state judges (including three members of this Court) concluded that a dog sniff of a garage door did not violate the Fourth Amendment.  Although these cases necessarily involved different facts, their uniformity refutes the dissent's assertion that a reasonable officer should have realized that a dog sniff of a garage door was *categorically* unconstitutional.  Indeed, even now, it is unclear whether a dog sniff of a garage door is unconstitutional.  The dissent urges that *Florida v. Jardines*[9] and *Kyllo v. United States*[10] inexorably lead to this conclusion.  But the dissent ignores cases holding that a driveway is not part of the home's curtilage[11] and a dog is not the type of "sense-enhancing" tool discussed in *Kyllo*.[12]  To deny use of the evidence here would ill serve the purposes of the exclusionary rule.

## B.

Count One alleged that Holley conspired "with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally possess with the intent to manufacture and distribute, and to manufacture and distribute 100 or more marijuana plants, a violation of 21 U.S.C. § 841(a)(1) . . . [i]n violation of 21 U.S.C. § 846."  Holley concedes that "there was sufficient evidence to convict [him] of conspiring with the intent to distribute and

---

[8] *Massi*, 761 F.3d at 532 (citing *United States v. Leon*, 468 U.S. 897, 919-20 (1984)).

[9] 133 S. Ct. 1409 (2013).

[10] 533 U.S. 27 (2001).

[11] *See United States v. Beene*, 818 F.3d 157, 162-63 (5th Cir. 2016).

[12] *See Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005); *see, e.g., United States v. Shuck*, 713 F.3d 563, 568-69 (10th Cir. 2013); *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010).

distributing *cultivated* marijuana."[13]   But he urges there was not sufficient evidence to convict him of the offense charged in the indictment—conspiring to distribute marijuana *plants*.  That is, Holley argues that the Government only proved that he conspired to distribute marijuana that was harvested from the plants discovered in his grow houses, not the plants themselves.

Holley's position is unconvincing.  By its plain text, there are six different ways to violate § 841(a): (1) manufacturing a controlled substance; (2) distributing a controlled substance; (3) dispensing a controlled substance; or possessing with the intent to (4) manufacture, (5) distribute, or (6) dispense a controlled substance.  Count One alleged that Holley conspired to violate § 841(a) in four of these six ways: he conspired to manufacture marijuana plants; he conspired to distribute marijuana plants; he conspired to possess with the intent to manufacture marijuana plants; and he conspired to possess with the intent to distribute marijuana plants.  Although the indictment listed these different ways of violating § 841(a) using "and" rather than "or," the Government still only had to prove that Holley conspired to violate the statute in *one* of these four possible ways.[14]

The Supreme Court has instructed that the "general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as [Holley's] indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged."[15]   Put another way, Holley's sufficiency challenge fails if there was sufficient evidence that he

---

[13] Holley's Opening Brief at 28.

[14] "It is well-established in this Circuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980) (per curiam); *see also, e.g.*, *United States v. Hoeffner*, 626 F.3d 857, 863-64 (5th Cir. 2010) (per curiam); *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir. 1991).

[15] *Turner v. United States*, 396 U.S. 398, 420 (1970); *see also Griffin v. United States*, 502 U.S. 46, 56-57 (1991).

No. 15-40360

entered a conspiracy to *either* manufacture marijuana plants, distribute marijuana plants, possess with the intent to manufacture marijuana plants, *or* possess with the intent to distribute marijuana plants.[16]  There undoubtedly was.  Though Holley contends that he did not conspire to *distribute* marijuana plants, there is ample evidence that he conspired to *manufacture* marijuana plants.  At trial, the Government introduced evidence that several different people assisted Holley with his grow operation: (1) Nick Neighbors provided unspecified assistance; (2) Justin Brown provided advice about chemicals; (3) Michael Strickland was the emergency contact for one of the grow houses; (4) Justin Dismore put his name on the utilities for one of the grow houses; (5) Louis Lee put his name on the utilities for a different grow house; and (6) Blake Huggins was found at one of the grow houses and possessed a schematic for a hydroponic marijuana cultivation system.  The Government had to establish only that Holley conspired with one of these individuals to prove a violation of § 846.[17]  "[C]onsidering the evidence and all reasonable inferences in the light most favorable to the prosecution,"[18] a rational jury could have concluded that Holley conspired with all six.

## C.

Count Three alleged that Holley possessed the H&K handgun "in furtherance of a drug trafficking crime . . . to wit: conspiracy to possess with intent to distribute and manufacture, distribute, and manufacture marijuana plants as alleged in Count One of th[e] Superseding Indictment" in violation of 18 U.S.C. § 924(c).  Holley appears to concede that he possessed a firearm in furtherance of a drug trafficking crime—but not the one alleged in

---

[16] *See, e.g.*, *United States v. Durman*, 30 F.3d 803, 810 (7th Cir. 1994); *United States v. Richman*, 600 F.2d 286, 298 (1st Cir. 1979).

[17] *See United States v. Scott*, 48 F.3d 1389, 1392-93 (5th Cir. 1995).

[18] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

indictment.    Similarly    to    Count    One,    Holley    acknowledges    that    the Government    presented    evidence    that    he    "possessed    the    HK    .45    caliber handgun . . . in connection with possession and selling harvested marijuana."[19] But he argues that "the government presented absolutely no evidence that [he] possessed the handgun when allegedly conspiring to posses[s] with intent to distribute and manufacture, distribute, and manufacture marijuana *plants*."[20]

The same principles apply as above.  Though Count Three was pleaded conjunctively, the Government had four different routes to a conviction: (1) Holley possessed the handgun "in furtherance of" a conspiracy to manufacture marijuana plants; (2) Holley possessed the handgun "in furtherance of" a conspiracy to distribute marijuana plants; (3) Holley possessed the handgun "in furtherance of" a conspiracy to possess with the intent to manufacture marijuana plants; *or* (4) Holley possessed the handgun "in furtherance of" a conspiracy to possess with the intent to distribute marijuana plants.  Because the jury returned a general verdict, it "stands if the evidence is sufficient with respect to any one of" these four alternative ways of violating § 924(c).[21] Therefore, the relevant question is whether the Government presented sufficient evidence that Holley possessed a handgun "in furtherance of" *one* of the four drug trafficking conspiracies alleged in Count One.

We conclude that the Government presented sufficient evidence that Holley possessed the H&K handgun "in furtherance of" a conspiracy to manufacture marijuana plants.  This Court has held that evidence that a firearm is being used to protect a drug operation against robbery is sufficient to support a conviction under § 924(c).[22]  We have delineated eight factors that

---

[19] Holley's Opening Brief at 32.

[20] *Id.*

[21] *Turner v. United States*, 396 U.S. 398, 420 (1970).

[22] *United States v. Ceballos-Torres*, 218 F.3d 409, 415 (5th Cir.), *as amended on denial of reh'g en banc*, 226 F.3d 651 (5th Cir. 2000).

No. 15-40360

help distinguish a firearm that is being used to protect a drug operation from one that is merely present at the scene of a drug crime:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.[23]

Almost all of these factors weigh against Holley: (1) Holley was "engaged in significant drug activity";[24] (2) the handgun was found a short distance from Holley; (3) the handgun is large caliber and semi-automatic;[25] (4) the handgun may have been stolen;[26] (5) Holley is a convicted felon, so the possession was illegal; (6) the handgun was found in the same case as two loaded magazines and a box of ammunition; (7) the handgun was found on the same shelf as $9,990 in drug profits and in the same house as ten pounds of marijuana and two trays of drying marijuana;[27] and (8) the handgun was found during the search of a house involved in Holley's grow operation. As a result, a rational jury could have readily concluded that Holley used the H&K handgun to protect his marijuana manufacturing operation.

Holley's only reply is that the handgun "was *not* located at the grow house and there is no indication that it was used to protect the marijuana plants at the grow house."[28] This argument is unpersuasive. The evidence at

---

[23] *Id.* at 414-15; *see also United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006).

[24] *See United States v. Yanez Sosa*, 513 F.3d 194, 201 (5th Cir. 2008).

[25] *See United States v. McGehee*, 672 F.3d 860, 872 (10th Cir. 2012) ("[T]he gun was . . . a 'large caliber semi-automatic which could [be] easily concealed.' . . . Our cases suggest that such handguns are frequently used in similar drug-trafficking crimes, where the offender needs protection because of the high-stakes, dangerous nature of the offense." (third alteration in original)).

[26] The gun was originally sold to a woman uninvolved in the drug conspiracy. At trial, she testified that she left the gun with her ex-husband. She did not know if her ex-husband—who was a friend of Holley—gave the gun to him.

[27] *See United States v. Molinar-Apodaca*, 889 F.2d 1417, 1424 (5th Cir. 1989); *see also United States v. Young*, 340 F. App'x 226, 229 n.4 (5th Cir. 2009).

[28] Holley's Reply Brief at 15.

11

trial established that Holley was the mastermind of a large grow operation involving several houses. Although the handgun was not found at a grow house, it would have been reasonable for the jury to infer that Holley carried the gun when he traveled to the grow houses and used it to protect the larger grow operation. This is especially true because the police found evidence at the Gray Wolf Trail house connecting it to the grow houses, including a utility bill for the Winterwood Lane house and drying marijuana.[29] Accordingly, "considering the evidence and all reasonable inferences in the light most favorable to the prosecution,"[30] there was sufficient evidence to support Holley's § 924(c) conviction.

## D.

Counts Two and Three both alleged that Holley possessed a firearm "affecting interstate commerce." Holley contends that the evidence presented at trial was insufficient to establish that the H&K handgun "affect[ed] interstate commerce" because it demonstrated only that the handgun moved in *foreign* commerce—not *interstate* commerce. As Holley concedes, this argument is foreclosed by prior decisions of this Court.[31]

## III.

For the reasons stated above, we AFFIRM.

---

[29] Officer Putman testified that "[t]he only time, in [his] experience, [he has] ever seen dried-up leaves are actually at a marijuana grow."

[30] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

[31] *See United States v. Guidry*, 406 F.3d 314, 318 & n.3 (5th Cir. 2005) ("The interstate commerce element of a § 922(g)(1) charge is satisfied where the government demonstrates that the firearm was manufactured out of state."); *United States v. Young*, 730 F.2d 221, 224-25 (5th Cir. 1984).

No. 15-40360

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

Under cover of darkness, at approximately five o'clock in the morning, a police officer walked through an alleyway to the door of Holley's attached, rear-entry garage.[1] The officer brought along a drug-detection dog who allegedly "alerted to the presence of the odor of an illegal drug while sniffing the garage door." Despite those facts, the majority affirms the district court's denial of Holley's motions to suppress. Because I conclude that the district court erred, I respectfully dissent.

## I.

In *Davis v. United States*, the Supreme Court held "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 564 U.S. 229, 232 (2011). In 2008, when these searches were conducted, there existed no "unequivocal" and "binding" Fifth Circuit precedent "specifically authorizing" police to come onto a person's property with a drug-detection dog in order to have the dog sniff at the garage doors. The majority states that "Holley does not point us to a single pre-*Jardines* decision that invalidated a search factually similar to those under review." Like Holley, the Government cannot point to a single binding decision in which a similar search was deemed valid.

The majority states that the search was "'close enough to the line of validity' that an objectively reasonable officer would not have realized that the Gray Wolf Trail and Winterwood Lane warrants were tainted." The majority adds that "[i]n these circumstances, '[t]o suppress the evidence derived from th[ese] warrant[s] would not serve the interest of deterring future

---

[1] The dog sniffs took place on March 25, 2008, and April 7, 2008—both at "approximately" 5:00 a.m.. The sun rose at 7:22 a.m. on the 25th and 7:05 a.m. on the 7th. *See* Sunrise & Sunset for Dallas, TX, The Old Farmer's Almanac, 2016, http://www.almanac.com/astronomy/rise/TX/Dallas/2008-04-07.

constitutional violations.'" *United States v. Massi*, 761 F.3d 512, 532 (5th Cir. 2014) (citing *United States v. Leon*, 468 U.S. 897, 919−20 (1984)). I disagree. This is not the sort of police action that the good-faith exception is intended to protect.

## II.

The good-faith exception is inapplicable in this case. Under the good-faith exception to the exclusionary rule, evidence is admissible if it is obtained by law enforcement officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate. *Leon*, 468 U.S. at 927−28. The majority reasons that the disputed dog sniffs took place in 2008 before the Supreme Court's issuance of *Florida v. Jardines*, 133 S. Ct. 1409 (2013)—which found that a warrantless dog sniff of a person's porch violated the Fourth Amendment—and does not address that opinion's effect on this case. Instead, the majority suggests that one unpublished opinion from the Fifth Circuit, *United States v. Tarazon-Silva*, along with a few other non-binding cases,[2] demonstrate that the dog sniffs were "close enough to the line of validity." 166 F.3d 341, 1998 WL 912178 (5th Cir. 1998).

In *Tarazon–Silva*, a panel stated that a "dog-sniff of the outer edge of the garage and the dryer vent on the exterior wall of the [defendant's] house did not occur on protected curtilage" and thus the defendant "had no reasonable expectation of privacy in those areas." *Id.* at *1. Reliance on *Tarazon-Silva* is problematic for a least two reasons. The first is that *Tarazon-Silva* is not binding precedent. *See Ballard v. Burton*, 444 F.3d 391, 401 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4 ("An unpublished opinion issued after January 1, 1996

---

[2] The majority cites a few non-binding cases, some of which are unpublished. *See, e.g.*, *United States v. Vasquez*, 909 F.2d 235, 238 (7th Cir. 1990); *United States v. Hogan*, 122 F. Supp. 2d 358, 367-69 (E.D.N.Y. 2000); *Stauffer v. State*, No. 14-03-00193-CR, 2004 WL 253520, at *2-3 (Tex. Ct. App. Feb. 12, 2004) (unpublished); *Smith v. State*, No. 01-02-00503-CR, 2004 WL 213395, at *3-4 (Tex. Ct. App. Feb. 5, 2004) (unpublished).

is not controlling precedent, but may be persuasive authority."). The second is that *Tarazon-Silva* lacked any substantial factual analysis. In a one page opinion, the panel merely concluded that the search did not occur on protected curtilage. *Tarazon-Silva* provides scant analytical guidance and is, in my view, improperly relied upon by the majority.

The majority implies that the absence of a similar case prohibiting this type of search pre-*Jardines* protects the officer's actions. Essentially, their holding would suggest that a search is reasonable so long as no court has explicitly found a search under identical circumstances to be unreasonable. *Jardines* did not announce a new rule and thus this type of warrantless search was not "close enough to the line of validity" even pre-*Jardines*. *See United States v. Burston*, 806 F.3d 1123, 1129 (8th Cir. 2015) (finding that *Davis* does not apply because no cases "serve as binding precedent to permit the drug-detection dog sniff in this factual context").

### III.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740220 (1979)). The Supreme Court has long recognized that "when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 133 S. Ct. at 1414. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be

free from unreasonable governmental intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

The Supreme Court specifically addressed the interplay between the Fourth Amendment and the good-faith exception in *Leon*, noting that it was not "persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state." *Leon*, 468 U.S. at 924. The Supreme Court elaborated:

> The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. . . . There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated. Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate. . . . If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue. Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue.

*Id.*

The Supreme Court stated that it regards "the area 'immediately surrounding and associated with the home'—what [its] cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 133 S. Ct. at 1414−15 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)). "That principle has ancient and durable roots." *Id.* "Just as the distinction between the home and the open fields is 'as old as the common law,' [*Hester v. United States*, 265 U.S. 57 (1924)], so too is the identity of home and what Blackstone called the 'curtilage or homestall' for the 'house protects and

No. 15-40360

privileges all its branches and appurtenants.'" *Id.* (quoting 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769)). In *Jardines*, the Supreme Court recognized that the front porch of a home "is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" 133 S. Ct. at 1415. "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Ciraolo*, 476 U.S. at 212–13.

The Fourth Amendment has long protected against unwarranted searches of a person's home and its curtilage. In 1961, the Supreme Court stated that "[t]he Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511–12 (1961) (citing *Entick v. Carrington*, 19 Howell's State Trials 1029, 1066; *Boyd v. United States*, 116 U.S. 616, 626–630 (1886)). In 1980, the Supreme Court specifically stated that the "Fourth Amendment draws 'a firm line at the entrance to the house.'" *Payton v. New York*, 445 U.S. 573, 590 (1980).

In *Kyllo*, the Supreme Court noted that where "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Kyllo v. United States*, 533 U.S. 27, 40 (2001); *see also United States v. Beene*, 818 F.3d 157, 165–75 (5th Cir. 2016) (Graves, J., dissenting). The device utilized in this case was a drug-detection dog. "[D]rug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to convey clear and reliable information to their human partners." *Jardines*, 133 S. Ct. at 1418 (Kagan, J., concurring) (citing *Florida*

17

*v. Harris*, 133 S.Ct. 1050, 1053–1054, 1056–1057 (2013)). Justice Kagan's concurrence noted that drug-detection dogs "are to the poodle down the street as high-powered binoculars are to a piece of plain glass. Like the binoculars, a drug-detection dog is a specialized device for discovering objects not in plain view (or plain smell)." *Id.* While her concurrence gives a particularly relevant example, the concept is based on 2001's *Kyllo*—decided seven years before the present search.[3]

Here, the search was conducted at the door of a rear-entry garage. Courts utilize four factors to determine if an area is within the curtilage of the home: (1) "the proximity of the area claimed to be curtilage to the home;" (2) "whether the area is included within an enclosure surrounding the home;" (3) "the nature of the uses to which the area is put;" and (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Holley's garages were attached and therefore enclosed within the home. The garage served as an entrance to the home. *See generally Burston*, 806 F.3d at 1127 (finding an area six to ten inches from defendant's window to be part of the curtilage). A garage is often used for home purposes—it can serve as a workshop, a family room, an exercise room, or a place for storage of home goods.

Still, the Government contends that the driveway upon which the officer and the drug-detection dog stood was open to the public. The driveway, however, was removed from the street and accessible only by an alleyway. The Government implies that it was open to the public. I cannot agree. The

---

[3] The majority cites *Illinois v. Caballes* for the proposition that "a dog is not the type of 'sense-enhancing' tool discussed in *Kyllo*." 543 U.S. 405, 410 (2005). The Supreme Court did not state this. Instead, the Supreme Court drew a distinction between the expectation of privacy in one's home and that of the trunk of one's vehicle during a "concededly lawful traffic stop." *Id. Kyllo* evidenced the Supreme Court's "intention to draw both a 'firm' and a 'bright' line at 'the entrance to the house.'" *Jardines*, 133 S. Ct. at 1419 (Kagan, J., concurring).

implication is that the Fourth Amendment right in these circumstances only arises upon the erecting of a fence, the closing of a gate, or the posting of a sentry. Holley had his garage door closed—that should be enough, in my view, to keep away uninvited guests at 5:00 a.m.. Furthermore, I do not suggest, as the majority states, that a "dog sniff of a garage door [i]s *categorically* unconstitutional." This *specific* search is, in my view, unconstitutional.

In *Jardines*, the Supreme Court described the lack of invitation for an officer to approach a home with a drug-detection dog and how the situation violates social norms. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Jardines*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011)). "But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*." *Id.* The Supreme Court noted that this is the type of situation that would inspire someone to call the police on the trespasser. In this case the officer came onto Holley's property at 5:00 a.m.—thus violating social norms and distinguishing this situation from when a Girl Scout or a trick-or-treater approaches a person's door from an open walkway.[4] This is common sense and not a new rule

---

[4] The majority concludes that I "ignore cases holding that a driveway is not part of the home's curtilage," and then cites *United States v. Beene*, 818 F.3d 157, 162-63 (5th Cir. 2016). *Beene*, however, did not announce a broad rule that a driveway is not part of a home's curtilage. Instead, the majority conducted a factual analysis under the *Dunn* factors and stated that "the driveway's proximity to the residence weigh[ed] in favor of a finding that it was part of the curtilage of the home." *Id.* at 162. Here, the garage is essentially part of the home because it is directly attached and serves as the entrance to the home—much like the front porch in *Jardines*.

No. 15-40360

of law.[5] Accordingly, in my view, the initial dog sniff constituted an unreasonable and illegal unwarranted search.

## IV.

Having described the illegality of the initial dog sniff, I turn to its effect on the later obtained warrant. The affidavit to support the search warrant relied heavily on two "free-air sniff" dog searches of Holley's rear-entry garage at approximately 5:00 a.m. on two different days.[6] On both occasions, the dog allegedly "alerted to the presence of the odor of an illegal drug while sniffing the garage door." Based largely upon the canine alerts, an officer sought and received a search warrant for the Gray Wolf Trail house. Officers first searched Gray Wolf and then Winterwood, which was discovered as a result of the records found during the execution of the Gray Wolf search warrant. Before obtaining a warrant to search Winterwood, an officer again conducted a warrantless dog sniff of the property.

---

[5] The majority does not address the timing of the search, but it serves to add to the common sense conclusion that the search violated social norms. The Illinois Supreme Court recently considered a search happening in the early morning hours. *See generally People v. Burns*, 50 N.E.3d 610, 630 (Ill. 2016) ("We hold that the warrantless use of a drug-detection dog at 3:20 a.m. at defendant's apartment door, located within a locked apartment building, violated defendant's rights under the fourth amendment to the United States Constitution."). Further, Justice Alito utilized the timing of the search in *Jardines* as support for its reasonableness in his dissent. *See Jardines*, 133 S. Ct. at 1423 (Alito, J., dissenting) ("He adhered to the customary path; he did not approach in the middle of the night; and he remained at the front door for only a very short period (less than a minute or two).") Justice Alito went on to cite an Idaho Court of Appeals case where the court held that "'[f]urtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm.'" *Id.* (quoting *State v. Cada*, 923 P.2d 469, 478 (Idaho Ct. App. 1996)).

[6] A confidential informant told an officer that Holley was a large volume marijuana dealer. The informant stated that Holley lived in a house near Preston Road and Frankford Road and that he drove a white Lincoln Navigator. A search revealed that Holley owned a Navigator and that he lived at 6203 Gray Wolf Trail in Dallas—approximately one mile from the intersection of Preston and Frankford. Still, the affidavits would have been paltry, at best, without the dog sniffs.

The later issued warrant, however, does not sanitize an otherwise illegal search. As noted by the Eighth Circuit, "[i]f clearly illegal police behavior can be sanitized by the issuance of a search warrant, then there will be no deterrence, and the protective aims of the exclusionary rule will be severely impaired if not eliminated." *United States v. O'Neal*, 17 F.3d 239, 243 n.6 (8th Cir. 1994); *see also United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005) ("In this case, it was not an 'objectively reasonable law enforcement activity' but rather the officers' unlawful entry into [defendant's] apartment that led to [the officer's] request for a search warrant. In such a situation, 'the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling.'"); *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989) (noting that "good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search"); *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (declining to apply the good-faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); *United States v. Mowatt*, 513 F.3d 395, 405 (4th Cir. 2008) *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011) ("The *Leon* exception does not apply here because *Leon* only prohibits penalizing officers for their good-faith reliance on magistrates' probable cause determinations. Here, the exclusionary rule operates to penalize the officers for their violation of [defendant's] rights that preceded the magistrate's involvement."); *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987) (holding that *Leon* exception did not apply when warrant was based on information obtained in illegal warrantless search because "[t]he constitutional error was made by the officer ..., not by the magistrate"); *United States v. Davis*, 430 F.3d 345, 358 n.4 (6th Cir. 2005) ("[W]e agree with the numerous other circuits that have held that the *Leon* good-faith exception is

inapplicable where a warrant was secured in part on the basis of an illegal search or seizure.").

Because the later issued warrant was based on an illegal search, the evidence obtained through the use of the warrants should be excluded as fruit of the poisonous tree. *See Nix v. Williams*, 467 U.S. 431, 441 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)); *see also Segura v. United States*, 468 U.S. 796, 804 (1984) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (citation omitted)). The good-faith exception limits exclusion where "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922. This is not such a case. In this situation, excluding the tainted evidence would advance the interest of deterring unlawful police conduct in the form of the invasion of a person's home space with a drug-detection dog in the early morning hours. Where the benefits produced by suppressing the evidence are not merely marginal or nonexistent and do justify the costs of exclusion, the good-faith exception does not apply. *See Massi*, 761 F.3d at 537 (Graves, J., dissenting) (citing *Leon*, 468 U.S. at 922).

## V.

As a direct result of a constitutional violation, authorities obtained a search warrant. Thus, the evidence obtained as a result of that search is tainted. Exclusion of that tainted evidence would certainly advance the interest of deterring unlawful police conduct. Because the warrant was based on an illegal and unreasonable search, I cannot conclude that the good-faith

exception applies in this instance. I do not agree that "the two dog sniffs were 'close enough to the line of validity' that an objectively reasonable officer would not have realized that the Gray Wolf Trail and Winterwood Lane warrants were tainted." The officer did not act on binding precedent. Instead, he intruded into a constitutionally protected area with a drug-detection dog at five o'clock in the morning. The majority's holding permits officers to utilize drug-detection dogs on protected property without a warrant and then to utilize any evidence obtained to subsequently acquire a warrant. Because I conclude that Holley's motions to suppress should be granted, I respectfully dissent.